**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No.   4:24-cr-00299-MTS-PLC-2 |
| vs. | ) |
| | ) |
| ZHAMONIQ STEVENS, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW, Defendant Zhamoniq Stevens, by and through undersigned counsel, and respectfully submits this Sentencing Memorandum for the Court's consideration. For the reasons set forth below, and pursuant to the factors delineated in 18 U.S.C. § 3553(a), Ms. Stevens submits that a sentence well below the advisory Guideline range would be sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

Specifically, Ms. Stevens asks the Court to consider a non-custodial sentence, including a term of probation with stringent conditions, as an appropriate and potentially more effective option in this case. Such a sentence would maximize restitution, provide the longest period of structured supervision allowed by statute, and directly address the mental health and socioeconomic factors that made Ms. Stevens both a target of, and participant in, this scheme.

## INTRODUCTION

On August 25, 2025, Ms. Stevens pled guilty to Count One of the Superseding

1

Indictment, charging Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349. The Presentence Investigation Report ("PSR") calculates a Total Offense Level of 26, with a Criminal History Category of I, resulting in an advisory Guideline imprisonment range of 63 to 78 months. As the Court is aware, that range is driven almost entirely by the loss table and victim-related enhancements, not by Ms. Stevens' personal level of gain, planning, sophistication, or future risk.

The Guidelines do not fully account for the extraordinary combination of mitigating circumstances in this case, such as Ms. Stevens' very limited role as a low-level courier; the Government's own acknowledgment that she is the least culpable participant among the charged co-defendants; a childhood marked by poverty, violence, and ongoing sexual abuse; serious and longstanding mental health struggles, including multiple suicide attempts; her youth, lack of prior felony record, and history of trauma-driven substance use; her genuine remorse; and the enormous restitution obligation that will follow her for the rest of her life.

Taken together, these factors show that the advisory Guideline range is far greater than necessary to punish, deter, and protect the public in Ms. Stevens' case. A sentence significantly below that term—up to and including a term of probation with stringent conditions—would better serve both the public and the victims by maximizing restitution, stabilizing Ms. Stevens' mental health, and reducing the risk of future criminal conduct.

## ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS

### A. Nature and Circumstances of the Offense

There is no dispute that this was a serious fraud scheme. As detailed in the PSR, it

2

was based in an Indian call center where conspirators manipulated victims for weeks or months, convincing them to part with their life savings. The handlers—co-defendants Parekh, Darji, and Singh—utilized strangers (like Ms. Stevens) to act as couriers on their behalf to collect the gold from the victims, then took possession of the gold, shipped it onward, and paid the couriers a small fee per trip.

Ms. Stevens is held accountable for approximately $7.6 million of the $9.3 million loss based on the timing of her entry into the conspiracy and foreseeable transactions, even though she personally received only small payments for her time and reimbursement for her travel expenses. The Government itself acknowledges that Ms. Stevens is the least culpable of the charged defendants.

The PSR further explains that co-defendant Lambert, also a courier, was more culpable because she recruited Ms. Stevens. The handlers—Singh, Parekh, and Darji—are described as progressively more culpable, with Mr. Darji identified as the most culpable of the group. The Guidelines partially reflect this reality through the 2-level minor-role reduction applied to Ms. Stevens.  Even with the adjustment, the Guidelines here still treat her much more like those who personally engineered and benefitted from a multi-million-dollar international fraud scheme than a low-level courier, because the minor role reductions are static amounts and not proportional to the corresponding offense level which rises drastically along with the amount of loss.

In any event, Ms. Stevens functioned at the bottom of the conspiracy's hierarchy. She did not design the scheme, did not control where or how victims were contacted, and did not direct the ultimate flow of money. She was instructed rather simply where to go,

3

what to pick up, and to whom she should turn the packages over. She was a replaceable, low-paid courier—a "money mule"—whose role was to physically move property that others had already stolen through manipulation. In many ways, her role was designed to keep her in the dark about what she was actually doing, with the handlers using many of the psychological tactics they used on their victims to manipulate Ms. Stevens as well. This was not necessarily to protect Ms. Stevens from prosecution, but more so to prevent Ms. Stevens from discovering the details and extent of the ongoing conspiracy which could compromise the greater conspiracy.

The conspirators chose their couriers much the same way they chose their elderly victims: they looked for people who were vulnerable, financially desperate, and susceptible to persuasion. Ms. Stevens fits that description. Her history of trauma, untreated mental health conditions, limited education, and chronic economic insecurity made her an easy target for older, more sophisticated co-conspirators promising quick money and minimal risk. That reality does not excuse her conduct, but it provides critical context for why she, of all people, was brought into this conspiracy. Ms. Stevens' own feelings about how she ended up involved in the scheme closely track the statements of some of the victims, where she still does not understand how or why she followed the conspirators instructions and failed to think logically about the situation while she was participating in it.

## B. History and Characteristics of Ms. Stevens

Ms. Stevens' personal history is marked by trauma, instability, and mental health struggles that began in early childhood and continued into young adulthood.

4

1. Childhood in a Violent, Impoverished Environment

Ms. Stevens was born in 2001 in Plant City, Florida. Her father was incarcerated on drug charges when she was only three years old and did not return to the home until she was approximately twelve. During those formative years, Ms. Stevens was raised primarily by her mother in an unstable, impoverished household that relied on Social Security disability payments for Ms. Stevens and her brother, as well as intermittent support from her mother's partners. The family at times struggled to keep the utilities on but "her mother always made a way to make sure they had what they needed."

The PSR describes the neighborhood where Ms. Stevens grew up as "rough" and "filled with drugs, violence, and prostitution." As a young child, she witnessed an argument at a gas station where her mother's partner's throat was cut. Her brother witnessed two men murdered outside their bedroom window. A gentleman's club up the street contributed to the pervasive prostitution and crime in the area. Exposure to this sort of violence and chaos at an early age is the backdrop against which Ms. Stevens' later choices must be understood.

2. Sexual Abuse and Normalization of Exploitation

The PSR also documents that Ms. Stevens was repeatedly sexually abused by a teenage male cousin beginning when she was in second grade. This cousin assisted with the care of Ms. Stevens and her brother while their mother was out of the home. The abuse continued into middle school. Ms. Stevens never disclosed it to her mother; instead, she and other younger female cousins were repeatedly abused by older male relatives to the point that the PSR notes it made the defendant, and the other victims involved feel as

5

if the abuse was normal.

This history is important for at least two reasons. First, it helps explain Ms. Stevens' profound struggles with self-worth, boundaries, and mental health. Second, it shows how exploitation became something she experienced long before she ever participated in this offense. Long before she was a "courier" for a fraud scheme, she was a child being used and exploited by adults and older relatives who should have protected her. This is likely why she was an ideal target for the organizers of the scheme, much in the same way the victims were vulnerable to the organizers' specific methods of manipulation.

3. Mental Health Diagnoses and Suicide Attempts

By approximately fourth grade, at the age of 10, Ms. Stevens had been diagnosed with Depression, Bipolar Disorder, and ADHD. She first verbalized suicidal thoughts at school, at one point lying under a water fountain and expressing a desire to die. While it may not sound serious on paper, authorities at her school and her psychiatric providers were so concerned that she was committed to a psychiatric hospital as a juvenile as the result of this episode.

Her mental health struggles did not subside over time, but instead escalated as she grew older. At age 17, she attempted suicide by overdosing on pills and was again admitted to a psychiatric hospital in Winter Park, Florida. At age 20, she attempted suicide again by laying in the middle of a street, leading to another Baker Act admission at Lakeside Medical in Belle Glade, Florida. Ms. Stevens described that hospitalization as "traumatizing" due to being restrained for long periods; she was discharged without

6

prescribed medications, and due to a lack of resources and family support, she did not receive intensive outpatient support following her release.

The PSR appropriately concludes that Ms. Stevens may benefit from participating in mental health treatment during any period of incarceration or while on supervision. Her history makes clear that, for most of her life, she has not received consistent, effective mental health care.  In fact, part of her struggles to maintain care involves the logistics of obtaining care in her circumstances–she is on medicaid, and she does not have a stable income, transportation, or home. She also suffers from depression–a diagnosis she received at age 10 and evidenced by her recurring struggles and admissions–which often suppresses her motivation to tackle long-term, challenging tasks, like obtaining psychiatric care.  These factors often compound, making it very difficult for Ms. Stevens to establish ongoing relationships with mental healthcare providers and attend her treatment.

4. Early School Failure, Limited Education, and Chronic Low-Wage Work

Ms. Stevens withdrew from ninth grade while attending Evans High School and was "kicked out" before attending an alternative program. She never obtained a high school diploma or GED. In adulthood, she bounced between low-wage jobs—Amazon driver, product sampler, TJ Maxx, temp agencies, Papa John's, and similar positions. Her work history is marked by short stints of employment followed by unemployment and reliance on her grandmother for support.

As the PSR notes, Ms. Stevens currently has no assets, no monthly income, and no ability to pay a fine. Yet she faces a restitution obligation in excess of $7.6 million. For

7

someone in her position, every year spent in custody—rather than working, gaining skills, and stabilizing her mental health—is a year in which restitution cannot meaningfully be paid.

Providing Ms. Stevens with probation in lieu of prison and supervised release creates an opportunity for her to increase her earning potential under the guidance and supervision of a U.S. Probation Officer for an additional two years, which provides the biggest opportunity for Ms. Stevens to meaningfully contribute to the repayment of victims.

5. Substance Use as Self-Medication, Unsophisticated Criminality

The PSR reports that Ms. Stevens began using marijuana at age 14 and progressed to daily use by age 16, which continued until her arrest. She denied the use of other illicit substances, and while on bond she has tested negative for drugs. Her marijuana use appears to fit the all-too-common pattern of a traumatized youth self-medicating unmanaged depression, bipolar symptoms, and anxiety, rather than engaging in typical "drug trafficker" behavior.  While she did take some medication for her diagnoses as a young child, her mother directed her to stop taking the medication, and as a result Ms. Stevens was never given a choice during her childhood to treat her psychiatric symptoms with prescribed medication.

6. Performance on Supervision, Support Network, and Remorse

Since her release on bond, Ms. Stevens has complied with the vast majority of her conditions. She has remained in the community without new criminal conduct, has tested negative for controlled substances, and has transitioned to living with her grandmother in

8

a residence that has been inspected and approved by the United States Probation Office in the Middle District of Florida.

She incurred violations related to attendance at counseling but did not reoffend or abscond. This is consistent with someone who has lifelong difficulty navigating treatment systems, not someone who is unwilling to be supervised altogether.

Most importantly, Ms. Stevens has accepted responsibility, cooperated with the criminal justice process, and expressed genuine remorse for her conduct and the harm it caused. She understands that elderly victims lost their life savings and that she played a role in that loss.

## C. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

This Court is asked to balance two hard truths. First, the offense is serious: elderly victims across the country were defrauded of retirement savings and life savings they will likely never fully recover. Second, Ms. Stevens is a deeply traumatized, mentally ill, young woman who was manipulated, misled, and used as a low-level courier in a scheme designed and controlled by others.

The Guideline range of 63–78 months reflects the first truth, but almost entirely ignores the second. It treats the courier in almost the same way it would treat a mastermind, because the loss table is indifferent to individual gain or role.

For a 23-year-old with no prior felony convictions, a felony conviction in federal court, a multi-million-dollar restitution judgment, and years of federal supervision are extraordinarily serious consequences. Even a relatively short term of imprisonment, if the

9

Court determines incarceration is necessary, would be a profound punishment for someone with Ms. Stevens' background. Adding additional months beyond what is necessary does not make the victims more whole; it does not meaningfully increase deterrence; it simply keeps Ms. Stevens out of the workforce and away from the mental health resources she desperately needs in the community.

A sentence well below the advisory Guideline range would still communicate to Ms. Stevens and to the public that her conduct was serious and unacceptable.  It would also recognize that she participated in exploiting vulnerable elderly victims and impose a real, tangible punishment that she will feel every day in the form of supervision, restitution, and the lifelong consequences of a felony conviction.

At the same time, such a sentence would respect the individualized sentencing mandate of § 3553(a), rather than allowing a loss-driven Guideline calculation to overshadow who Ms. Stevens actually is and how she came to be involved in this offense.

## D. The Need to Afford Adequate Deterrence and Protect the Public

For Ms. Stevens personally, the combination of this prosecution, the collateral consequences of a federal felony, and the massive restitution obligation are all powerful deterrents. ]She has been living under federal supervision without reoffending. There is nothing in her history to suggest that she is a chronic fraudster or that she will seek out similar opportunities in the future.

A sentence significantly below the Guidelines, especially if paired with a long term of supervision, will adequately deter Ms. Stevens from future criminal conduct. The structure, conditions, and oversight of supervision—not its length of incarceration—will

do the heavy lifting in her case.

The broader fraud-prevention message in this type of case is principally aimed at those who design and run such schemes, not at the couriers they recruit. While the architects of these overseas call center scams may be watching to see what happens to the people on the ground who get caught, many of them operate beyond the jurisdiction of the United States intentionally, and therefore a harsh sentence for Ms. Stevens does very little to alter their conduct.

On the other hand, imposing a sentence that recognizes Ms. Stevens' limited role, her cooperation with the process, and her trauma history does not undermine general deterrence. It still sends an important message: those who engineer and profit from such schemes will face substantial prison terms, and those who are used as couriers will be treated humanely. This differentiation encourages future low-level participants to cooperate with the criminal justice process and helps build cases against those most responsible.

From a public safety standpoint, the risk Ms. Stevens poses to the community can be effectively managed through conditions of supervision: mental health treatment, substance abuse monitoring, employment requirements, restrictions on travel and association, and financial transparency. Keeping her in federal prison for additional months does little to protect the public when compared to a robust supervision plan that keeps her working, in treatment, and accountable.

**E. The Need to Provide Educational and Vocational Training, Medical Care, and Other Correctional Treatment in the Most Effective Manner**

11

The PSR makes clear that Ms. Stevens may benefit from participating in mental health treatment during any period of incarceration or while on supervision. The question for the Court is where that treatment, education, and training can be provided most effectively.

For someone like Ms. Stevens, the most promising path will stabilize her mental health in a consistent treatment setting, and help her finish her education. From there, it would require her to develop job skills, maintain employment, and keep her in regular contact with a probation officer who can monitor both compliance and progress.

All of these goals can be accomplished in the community under a term of supervision, with or without a short custodial component. In contrast, a lengthy term of incarceration delays her entry into legitimate employment, interrupts her ability to build a mental health treatment team in the community, and often returns her to society with fewer support structures than before.

A sentence that prioritizes community-based treatment and education—under strict supervision—will better serve both Ms. Stevens and the public than a sentence that focuses primarily on months in the Bureau of Prisons.

## F. The Need to Avoid Unwarranted Sentencing Disparities

The risk of unwarranted disparity in this case runs in two directions. First, within this case, the PSR already recognizes that Ms. Stevens is the least culpable defendant among the charged participants. It would be an unwarranted disparity to impose on her a sentence that approaches or exceeds what more culpable handlers receive. A sentence well below both the advisory Guideline range and the Government's recommended term

is necessary to preserve the distinction between masterminds, handlers, and couriers. Second, across similar cases, low-level couriers and money mules who are recruited to assist in large call-center frauds are routinely treated more leniently than those who develop, direct, and profit from the scheme. The advisory Guidelines, driven heavily by the loss table, often obscure this difference. A downward variance in Ms. Stevens' case would help realign her sentence with national practice for similarly situated defendants—young, traumatized, non-violent couriers with minor roles and no significant criminal history.

### G. Probation as a Viable Sentencing Option

The PSR correctly notes that, because the advisory Guideline range of 63–78 months falls in Zone D, Ms. Stevens is Guideline-ineligible for probation. But after Booker, the Guidelines are advisory, and the Court has broad authority under § 3553(a) to vary downward and impose a non-Guideline sentence when appropriate.

As a Class C felony, Ms. Stevens' offense is statutorily eligible for a term of probation of not less than one nor more than five years. 18 U.S.C. § 3561(c)(1); see PSR ¶ 92. Importantly, probation offers several advantages in this case.

First, is the longer period of supervision.  The supervised release maximum in this case is three years, but the maximum length of probation is five years.  *See* PSR ¶ 90-92. This ensures Ms. Stevens the most possible time to stabilize her life, complete her education, obtain steady income, and maximize her restitution payments.  The reality is that victims will only receive meaningful payments if Ms. Stevens is working, stable, and in the community. Each month she spends in custody is a month in which she cannot

13

contribute even modest amounts toward restitution. A probationary sentence—especially one that requires continuous employment, financial disclosure, and application of windfalls to restitution—does more to compensate victims than additional incarceration.

Another major benefit of probation over incarceration and supervised release is the ability to modify and extend probation based on performance.  The Court has more tools in a probation sentence to address subpar performance short of simple revocation and additional imprisonment. By contrast, a shorter term of supervised release provides less flexibility to extend federal supervision purely for rehabilitative and restitution-focused purposes.

A probationary sentence can—and should—include robust conditions: mandatory mental health treatment; substance abuse assessment and testing; requirements to obtain a GED; vocational training; full-time lawful employment; restrictions on travel; a prohibition on working in positions that involve access to elderly persons' finances or sensitive personal information; and a strict restitution payment schedule. These conditions, enforced over several years, would provide daily, tangible accountability that is, in many respects, more demanding than additional months in prison.

To be clear, Ms. Stevens understands that she is not "entitled" to probation and that the Court may determine some period of incarceration is necessary. Her request is that the Court view probation—not as a "giveaway" or a reward—but as a structured, demanding sentence that keeps her on the hook longer, channels her toward treatment and employment, and generates more restitution for the victims than a purely custodial sentence ever could.

14

**CONCLUSION**

Ms. Stevens stands before the Court as the least culpable participant among the charged defendants in a serious fraud scheme, but also as someone whose life story mirrors the very vulnerability that the scheme exploited in its elderly victims. She grew up in a violent, chaotic environment; was sexually abused by trusted family members; struggled with serious mental illness and suicidality from childhood; left school early; and cycled through low-wage jobs and unemployment. Against that backdrop, older and more sophisticated conspirators recruited her, used her as a courier, and discarded her when the scheme began to unravel.

The advisory Guideline range of 63–78 months does not adequately account for those realities. Section 3553(a) requires the Court to impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing. In this case, that standard can be met with a sentence well below both the advisory Guideline range and the term contemplated by the Government—up to and including a sentence of probation with stringent, restitution-focused conditions.

Such a sentence would reflect the seriousness of the offense and the harm to elderly victims; recognize Ms. Stevens' limited role, youth, trauma, and mental health struggles; reward her acceptance of responsibility; protect the public through long-term supervision, treatment, and employment requirements; and maximize the likelihood that victims will receive meaningful restitution over time.

WHEREFORE, for the foregoing reasons, Ms. Stevens respectfully requests that the Court grant a substantial downward variance from the advisory Guideline range and

15

impose a sentence significantly below the Guidelines, including consideration of a non-custodial sentence of probation with strict, restitution-focused conditions, together with such other and further relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Matt Sander*
MATT SANDER, #70344MO
Fischer & Byrne, LLC
130 S. Bemiston Ave., Ste. 303
Clayton, MO 63105
314-231-0777 (Phone)
844-273-9163 (Fax)
mrslaw321@gmail.com

## CERTIFICATE OF SERVICE

The above-signed certifies that a copy of the foregoing was served via electronic filing to the United States District Court of Eastern Missouri, as well as, the United States Attorney's Office, on this 5th Day of January, 2026.